**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRIAN LAWRENCE,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation; and DOES 1 to 10, inclusive,<br><br>　　　　Defendants. | Case No. CV15-170 DSF (PJWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came before the Court on November 10, 2015 for a court trial on the administrative record. The Court now finds as follows.

## **FINDINGS OF FACT**

1. Defendant Life Insurance Company of North America (LINA) issued a group long-term disability policy to a multiple employer trust; Plaintiff's employer, SCS Engineers, was a Participating Subscriber. (A.R. 309-338.)

**Relevant Policy Provisions**

2. The Policy provides: "The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits. The Insurance Company will require continued proof of the Employee's Disability for benefits to continue." (A.R. 320.)

3. The Policy provides for a ninety-day Elimination Period, which is defined as "the period of time an Employee must be continuously Disabled before Disability Benefits are payable." (A.R. 320.)

4. "The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is: 1. unable to perform the material duties of his or her Regular Occupation; and 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." (A.R. 316.) "Regular Occupation" is defined as "[t]he occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." (A.R. 331.)

5. "Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the

1   Disability that conforms to generally accepted medical standards, including
2   frequency of treatment and care." (A.R 330.)

4   6.   "Written notice, or notice by any other electronic/telephonic means
5   authorized by the Insurance Company, must be given to the Insurance Company
6   within 31 days after a covered loss occurs or begins or as soon as reasonably
7   possible. If written notice, or notice by any other electronic/telephonic means
8   authorized by the Insurance Company, is not given in that time, the claim will not
9   be invalidated or reduced if it is shown that notice was given as soon as was
10  reasonably possible . . . ." (A.R. 325.)

12  7.   An insured must provide proof of loss to support a claim for long-term
13  disability benefits. (A.R. 326.)

15  **The Claim**

17  8.   Plaintiff Brian Lawrence was employed by SCS Engineers as a
18  Methane Gas Technician from 2007 to 2014. That position required the collection
19  of data for use by engineers. (*See* A.R. 181-185.)

21  9.   Lawrence stopped working in February 2013, when his doctor
22  recommended that he take a few weeks off work. (A.R. 243-244.) At the time he
23  stopped working, Lawrence had an upper respiratory infection that had persisted for
24  three weeks. (*Id.*)

26  10.  Lawrence did not return to his job at SCS Engineers after he stopped
27  working in February 2013. (A.R. 253.) He was eventually terminated.

11. Lawrence submitted a claim for long-term disability benefits on April 22, 2014. He claimed that his disability began more than a year before, on February 15, 2013. (A.R. 80.) Lawrence said in his claim form that he was disabled due to "hypertension." (A.R. 81.) Lawrence also stated that he could drive and that he walked up to half a mile daily "in different environments, mostly alone." (A.R. 175-177.) LINA identified two physicians in the claim form submitted to LINA: Boris Vaisman, M.D., and Henry Johnson, M.D. *Id.*

12. LINA obtained records from those two physicians. (A.R. 196-238.)

13. Dr. Vaisman's records showed that Dr. Vaisman had opined that Lawrence should not go to work for three weeks as of February 13, 2013, at which time he had a persistent upper respiratory infection. Dr. Vaisman opined that Lawrence should return to work on March 4, 2013. (A.R. 232.)

14. LINA sought clarification of Dr. Vaisman's opinion after Lawrence filed his claim for disability benefits; Dr. Vaisman's June 16, 2014 faxed response stated: "As far as I can tell, pt. is ready to work." (A.R. 169.) Lawrence's argument that this merely meant that Lawrence was willing, but perhaps unable, to work, is not persuasive.

15. Dr. Vaisman's records show that he treated Lawrence from February 2013 to February 2014. In February 2013, Dr. Vaisman noted that Plaintiff's blood pressure was elevated and medications were prescribed to control Plaintiff's hypertension. (A.R. 211.)

16. There is no evidence that Dr. Vaisman ever opined that Lawrence could not work because of his hypertension.

- 4 -

17.     On April 10, 2013, Dr. Vaisman noted that Lawrence's blood pressure was "well controlled." (A.R. 209.)

18.     On June 17, 2013, Lawrence saw Dr. Vaisman for symptoms related to kidney stones. (A.R. 208.) At that time, Lawrence's blood pressure had increased and he continued to be treated with medications to treat that condition. (*Id.*)

19.     On February 19, 2014, Plaintiff went to Dr. Vaisman with symptoms of bronchitis. (A.R. 206.)

20.     There is no evidence that Dr. Vaisman ever opined that Lawrence could not return to work after March 4, 2013.

21.     Lawrence also relied on a report from Henry Johnson, M.D., from May 3, 2013, three months after Lawrence stopped working. (A.R. 219-229.)

22.     Dr. Johnson opined that Lawrence had "musculoskeletal issues" and "psychological issues," but there is no evidence that Dr. Johnson relied on any testing beyond a physical examination or provided any treatment for any condition. There is also no evidence that Dr. Johnson referred Lawrence for any further testing, evaluation, or treatment. (A.R. 219-229.)

23.     Dr. Johnson's report lists Lawrence's complaints and finds that Lawrence had a "100% impairment" and that he was "totally temporarily disabled" due to physical and psychological issues. (A.R. 228.)

24.     Dr. Johnson stated that Lawrence had "widespread muscular pain" and

"nervousness with agitation." (A.R. 222.)

25. Lawrence's medical records were obtained and analyzed by a LINA Nurse Case Manager on June 6, 2014. (A.R. 53.)

26. The records were then referred for review by Penny Chong, M.D., a Board-certified internist and rheumatologist. (A.R. 40-41.) The records included the notes of Dr. Vaisman, who had seen Lawrence for the past year, and the report of Dr. Johnson. (A.R. 196-238.)

27. Dr. Chong opined that the restrictions claimed were not supported. (A.R. 40.) She noted that although Lawrence's blood pressure was suboptimal, there was no evidence of complications that could affect his functionality. (*Id*.) The records did not show that Lawrence had hypertensive cardiac disease and it did not appear that he was having any side effects from his medications that would affect his functionality. (*Id*.)

28. Based on the review and evaluation of the records and Dr. Chong's medical opinion, LINA informed Lawrence on June 17, 2014 that it had determined that he was not entitled to the benefits he sought. (A.R. 95-97.)

29. Lawrence submitted his appeal on July 7, 2014 and argued that his claim was wrongfully denied. (A.R. 165-166.) He said that a health oversight company had suspended him twice after his annual medical examinations, but he did not provide any dates or information regarding those purported suspensions. (A.R. 165.) He did not rely on reports from this entity (or anyone else) to support his disability claim. (A.R. 165-166.) He did not submit any additional documentation with his appeal. (A.R. 157.)

30. As part of the appeal and at LINA's request, James Butler, M.D., a physician who is Board-certified in Occupational Medicine, reviewed Lawrence's medical records and provided a report dated August 26, 2014. (A.R. 148-152.)

31. Dr. Butler opined that the records did not support the limitations claimed. (A.R. 151.) He noted that there was no apparent loss of strength or neurological issue. (*Id.*) Dr. Butler noted that although high blood pressure could lead to detrimental effects in the future, it would not cause immediate disabling restrictions or limitations at the stage at which Lawrence was experiencing the hypertension. (*Id.*) He noted, "There is no evidence that any reasonable restrictions are necessary and, in fact, the concept that he could not perform his job because of his blood pressure was elevated is not supported by any medical literature." (*Id.*)

32. Dr. Butler attempted to reach Dr. Johnson four times, but received no response. (A.R. 148.)

33. LINA also had Lawrence's records reviewed by a psychologist, Richard Frederick, Ph.D. (A.R. 145-147.)

34. Dr. Frederick noted that there had been no evaluation or treatment of any mental health issue. (A.R. 146.) There had been no review of symptoms or behavioral observations to provide a basis for any claim of a mental health impairment and there had been no psychological or psychiatric evaluation or visit with any mental health professional. (A.R. 147.) Dr. Frederick found no evidence of any mental, behavioral, or cognitive issue that would support occupational limitations. (*Id.*) Dr. Frederick also attempted to reach Dr. Johnson on four

1  different occasions to discuss his opinion, but he received no response.  (*Id.*)

3  35. LINA also evaluated Lawrence's vocational duties.  In accordance
4  with the Policy terms, LINA considered Lawrence's duties and job description in
5  the context of nationally recognized vocational codes from the Dictionary of
6  Occupational Titles.  (A.R. 188-194.)

8  36. Lawrence's occupation, which required testing and data collection for
9  engineers, required medium demand activities, because he had to sometimes exert
10 force to handle from ten to up to fifty pounds and, as such, his occupational
11 requirements exceeded the level for light work.  (A.R. 194.)

13 37. Following the medical reviews and the contact with Lawrence's
14 treating physician and the occupational review, LINA advised Lawrence, on
15 September 8, 2014, that the claim decision would be upheld on appeal.  (A.R. 85-
16 87.)  LINA explained that the medical information he submitted was insufficient to
17 support a claim for long-term disability benefits.  (A.R. 86.)

19 38. In the letter providing the decision following the appeal, LINA stated
20 that "a second appeal request is not required [by ERISA] but will be accepted if you
21 have different or additional information to submit."  (A.R. 86.)  Lawrence
22 submitted no further appeal or new information.

## **CONCLUSIONS OF LAW**

26 1. This action is governed by ERISA.  29 U.S.C. § 1132.

28 2. A court reviews a denial of ERISA benefits *de novo*, unless "the

- 8 -

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

3. The parties agree that a *de novo* standard of review applies here.

4. Under a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

5. Lawrence has the burden of proving entitlement to benefits. *Muniz v. Amec Construction Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). Therefore, Lawrence has the burden of proving by a preponderance of the evidence that he was "unable to perform the material duties of his … occupation as it is normally performed in the general labor market in the national economy." (A.R. 335.) Because of this, LINA had no obligation to conduct an examination of Lawrence in order to prove that he is not disabled. *See Ross v. Prudential Ins. Co. of Am.*, 304 F. App'x 502, 503 (9th Cir. 2008) ("Ross claims that Prudential was obligated to conduct an independent medical examination ('IME'). The Plan, however, puts the burden of proving limitations squarely on the claimant and provides only that an IME may be sought by Prudential at its expense. Ross fails to explain why the contractual limitation should be judicially modified in this case.").

6. The evidence proffered by Lawrence outside the record is inadmissible because it is not properly authenticated and the medical evidence from after the decision on Lawrence's claim is irrelevant. F.R.E. 901; F.R.E. 401.

7. Evidence outside the administrative record may only be considered

1  "when circumstances clearly establish that additional evidence is necessary to
2  conduct an adequate *de novo* review of the benefit decision." *Mongeluzo v. Baxter*
3  *Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995)
4  (quoting *Quesinberry v. Life Ins. Co. of North Am.*, 987 F.2d 1017, 1025 (4th Cir.
5  1993)).

7      8.    The only evidence that might be appropriately considered is from one
8  of Lawrence's treating physicians, Dr. Modupe Aiyegbusi. There is some evidence
9  that Lawrence informed LINA that he was seeing Dr. Aiyegbusi and that LINA
10  could have sought those records in making its determination. However, the records
11  from Dr. Aiyegbusi do not support Lawrence's position, as they show hypertension
12  that was generally well-controlled and no signs of other disabling physical or
13  psychological problems. (*See* Pl. Req. for Extrinsic Evid., Ex. 1.)

15      9.    Based on the evidence in the Administrative Record, Lawrence has not
16  met his burden of demonstrating that he was entitled to the disability benefits
17  sought.

18      a.    Lawrence's treating physician did not opine that he was disabled
19  through the Policy Elimination Period, and prior to the denial of the
20  claim the treating physician specifically stated that Lawrence was
21  "ready to work."
22      b.    The evidence in the administrative record shows that Lawrence's
23  hypertension is generally well-controlled and even when it is not, other
24  than Dr. Johnson's conclusory statements, there is no evidence that it
25  interferes with his job function or creates an undue risk of a life-
26  threatening event while on the job. That Lawrence may have been
27  previously temporarily suspended by a health oversight company does
28  not, by itself, prove ongoing disability. Lawrence criticizes Dr.

          Butler's assessment that high blood pressure in and of itself is not "terminal." But Lawrence's entire theory of why his hypertension is disabling is that it creates an undue risk of a serious acute medical event while he is alone in a remote area. In that context, it is relevant whether hypertension at the level suffered by Lawrence is likely to cause such an event.

    c. There is no evidence that Lawrence suffers from a disabling psychological condition. The only psychological evidence in the record is Lawrence's self-reported symptoms to Dr. Johnson. Dr. Johnson does not appear to have used any diagnostic tools to evaluate the psychological symptoms, even assuming that he would be qualified to do so. There is no suggestion in the records of Lawrence's treating physicians that Lawrence suffers from any serious psychological impairment. Even if Dr. Johnson's largely unsupported conclusion of "acute stress disorder" is accurate, there is insufficient support in the record to conclude that the condition would prevent Lawrence from performing the duties of his job.

    d. There is no reason to believe that the muscular issues reported by Dr. Johnson rise to the level of disabling conditions. Notably, Lawrence's treating physicians did not provide treatment for any serious muscular or joint issues.

Dated: 11/12/15

                                        Dale S. Fischer
                                        United States District Judge